**Jeston MURRAY, Appellant**

v.

**COMMONWEALTH of Kentucky, Appellee.**

No. 2011–SC–000081–MR.

Supreme Court of Kentucky.

May 23, 2013.

**400**

Robert Chung–Hua Yang, Assistant Public Advocate, Counsel for Appellant.

Jack Conway, Attorney General of Kentucky, Bryan Darwin Morrow, Assistant Attorney General, Counsel for Appellee.

Opinion of the Court by Chief Justice MINTON.

A circuit court jury convicted Jeston Murray of two counts of complicity to commit murder, one count of first-degree robbery, one count of first-degree burglary, and two counts of tampering with physical evidence. The charges stemmed from two incidents occurring nearly nine days apart.

Murray now appeals the judgment of conviction and sentence as a matter of right,[1] arguing that the trial court erred by (1) allowing the Commonwealth to bolster the testimony of his alleged co-conspirator, Michael Knights; (2) failing to sever for separate trials the two counts of murder; (3) failing to dismiss the two counts of tampering with physical evidence because the tampering statute is unconstitutional; (4) depriving Murray of a fair trial by permitting testimony of alleged homosexu-

---

1. Ky. Const. § 110(2)(b).

al conduct between Murray and Michael Knights; and (5) failing to instruct the jury on criminal facilitation regarding the murder of Darrell Spencer and the associated robbery. We find no error in the trial court's rulings and affirm the judgment of conviction and sentence.

## I. FACTUAL AND PROCEDURAL BACKGROUND.

Michael Knights and Jeston Murray, both of whom are deaf, met and became close while staying at the Salvation Army's homeless shelter.

### A. Murder of Darrell Spencer.

Knights and Murray entered an army surplus store in which Darrell Spencer was the lone clerk on duty. Knights wanted to buy some clothes but had no money. Murray, who had some money, did not buy anything. The two left the store and walked the streets, discussing possibly robbing the store.

After much discussion, the two returned to the store. The account of events in the store, ultimately resulting in the death of Spencer, was disputed at trial. In Murray's police statement, played at trial, he said he remained in the front of the store as a lookout while Knights went to the back of the store. Knights, on the other hand, testified that Murray acted alone in killing Spencer.

Hours after Murray and Knights left the store, police performing a welfare check discovered Spencer's nearly lifeless body hidden under cardboard. Spencer suffered multiple blows to the back of the head delivered with the flat end of a small axe taken from store merchandise. He died shortly after arrival at the hospital.

When Murray and Knights left the store, each carried two bags stuffed with merchandise, including clothes, a purse, knives, and the axe. Murray estimated the total value of these items to be around $1,000. They stored their plunder in a storage unit belonging to Murray, discarded the axe, and threw the clothes they were wearing at that time into the dumpster behind the Salvation Army homeless shelter.

### B. Murder of Marcus Penney.

A little over a week after the murder of Spencer, Knights and Murray ventured to the apartment of Marcus Penney, a common acquaintance from the deaf community. Penney was also the father of three children with Brandi Esque, a woman with whom Knights had been romantically involved. Knights resented Penney's relationship with Brandi. And Murray knew that Knights was upset about something as they walked to Penney's apartment.

Both Murray and Knights were armed with knives that they had stolen from the army surplus store. When they arrived at Penney's apartment, Knights knocked and received no response. They tried opening the door, but it was dead-bolted. Becoming agitated, Knights broke through the door and met Penney. Murray stood at the threshold of the apartment and watched as Knights and Penney fought. Knights pulled out his knife and stabbed Penney. Leaving Penney for dead, Murray and Knights fled the apartment, disposing of their knives and clothing.

### C. Murray Arrested and Convicted of Murders.

Within a short time, Murray and Knights's mutual friend, Shawna Grandall, went to the police offering to give a statement about the murders and Knights's involvement. According to Grandall, a few days before she came to the police, Knights had admitted to her that he committed two murders.

After Knights was arrested, Murray went to the police and gave a statement in which he acknowledged being present and involved in both murders. Murray fingered Knights as the perpetrator of both murders.

Murray and Knights were indicted by a grand jury for acting alone or in complicity to commit (1) two counts of murder, (2) one count of first-degree robbery, (3) one count of first-degree burglary, (4) and two counts of tampering with physical evidence. Knights pleaded guilty to the charges under an agreement for a total sentence of life in prison without parole for twenty-five years. Murray's case proceeded to trial.

Before trial, Murray moved for separate trials on the murder charges and for dismissal of the two counts of tampering with physical evidence. He argued that the murders were insufficiently related and that the tampering with physical evidence charges unconstitutionally impinged upon his Fifth Amendment right against self-incrimination. The trial court denied both motions.

The jury convicted Murray on all charges. Because the jury convicted Murray of the murder charges, the trial proceeded to the capital-sentencing phase in which the jury found an aggravating circumstance: Murray's acts were intentional and resulted in multiple deaths. The jury recommended concurrent life sentences without probation or parole for twenty-five years for the two murders.

Murray waived jury sentencing on the remaining charges and agreed to the following sentences: (1) ten years' imprisonment for first-degree robbery, (2) five years' imprisonment for each count of tam-

pering with physical evidence, (3) and ten years' imprisonment for first-degree burglary. The trial judge ordered these sentences served concurrently, as well.

Murray now appeals his conviction. For the reasons stated below, we affirm.

## II. ANALYSIS.

### A. Murray's Trial was not Unfair as a Result of the Questioning of Carl Christiansen by the Commonwealth.

▇▇▇ Carl Christiansen, a former FBI agent, was a private investigator hired by Murray. Murray called Christiansen as a defense witness at trial and questioned him about a pretrial interview with Knights, conducted by Murray's counsel, during which Christiansen was present and took notes. Murray argues that the trial court erred when it allowed the Commonwealth to bolster improperly Knights's trial testimony through its cross-examination of Christiansen. This issue involves the trial court's evidentiary ruling, which we review for an abuse of discretion.[2]

At trial, Knights testified regarding both the murders of Penney and Spencer. During direct questioning, Murray's counsel focused primarily on statements made by Knights to friends following the murders, to police, and to Murray's counsel during the pretrial interview with Christiansen. Additionally, Murray's counsel made it clear that Knights had courted the Commonwealth and written several letters before trial attempting to have his sentence lowered in exchange for testimony about Murray's involvement. Knights admitted to writing these letters and desiring to testify for the Commonwealth. But

---

**2.** *See Goodyear Tire & Rubber Co. v. Thompson,* 11 S.W.3d 575, 577 (Ky.2000). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Id.* at 581 (citing *Commonwealth v. English,* 993 S.W.2d 941, 945 (Ky.1999)).

Knights repeatedly denied admitting to both murders to Grandall, Esque, and Murray following the murder of Penney. And Knights vehemently denied killing Spencer. Indeed, Knights consistently insisted that it was Murray who killed Spencer while he was merely a lookout. Throughout this testimony, Murray's counsel doggedly confronted Knights with transcripts of prior statements, letters, and testimony of others in an attempt to draw attention to inconsistencies between Knights's trial testimony and his previous statements.

Further highlighting any inconsistencies in Knights's testimony, Murray asked Christiansen about what Knights said during the pretrial interview conducted by Murray's counsel. Christiansen's testimony, among other things, mainly consisted of a few differences from Knights's testimony: Knights said he was tired of Penney bothering Esque; Knights said he wasn't certain if Murray saw him kill Penney; and one person and one person alone, without the physical help of anyone, killed both Penney and Spencer.

On cross-examination of Christiansen, the Commonwealth immediately asked him who Knights said killed Spencer in the store, to which Murray objected on the grounds that the questioning was outside the scope of direct examination and was inadmissible hearsay. The Commonwealth argued that it should be allowed to rehabilitate Knights's earlier testimony; and, moreover, the statement should be allowed as a prior consistent statement. The trial court agreed with the Commonwealth and overruled the objection. Christiansen proceeded to testify that Knights did not specifically name who killed Spencer but described facts and circumstances regarding the incident. According to Christiansen, Knights said Murray went to the back of the store; and Spencer was lying on the floor when Knights went to the back of the store.

On appeal, Murray argues that he is entitled to a new trial because the Commonwealth's questioning of Christiansen amounted to improper bolstering; and the trial court erred by allowing the testimony under the prior-consistent-statement exception to the general exclusion of hearsay. We disagree. Murray is not entitled to relief.

Kentucky Rules of Evidence (KRE) 801A(a)(2) allows an out-of-court statement by the witness, otherwise excluded by the hearsay rule, to be admissible as long as it is "offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive."

In *Tome v. United States*,[3] the United States Supreme Court solidified the deeply rooted rule that prior consistent statements are only admissible if the statement is made prior to the existence of a motive to fabricate or lie.[4] But the Supreme Court in *Tome* was careful to limit the breadth of its ruling.[5] "Unless the

---

3. 513 U.S. 150, 115 S.Ct. 696, 130 L.Ed.2d 574 (1995).

4. The decision in *Tome* gives further strength to the well-known rule in Kentucky that "a witness cannot be corroborated by proof that on previous occasions he has made the same statements as those made in his testimony. Where, however, a witness has been assailed on the ground that his story is a *recent* fabrication, or that he has some motive for testify-

ing falsely, proof that he gave a similar account of the matter when the motive did *not* exist, *before* the effect of such an account could be foreseen, or when motive or interest would have induced a different statement, is admissible." *Eubank v. Commonwealth*, 210 Ky. 150, 275 S.W. 630 (1925).

5. *See United States v. Ellis*, 121 F.3d 908, 921 (4th Cir.1997).

rule's requirements are met, the statements are hearsay if offered as *substantive* evidence." [6]

Murray argues here that Knights's statement recorded by Christiansen and testified to by Christiansen was hearsay. The Commonwealth counters that the statement was merely offered for the limited purpose of rehabilitation. We are faced with the question of whether KRE 801A(a)(2) and its concomitant restrictions apply with equal force to prior consistent statements offered as substantive evidence and those offered for rehabilitation. We recognize a dissonance exists around this issue among courts across the country,[7] but we have recently answered the question in the affirmative.[8] And our precedent aligns with the majority of jurisdictions.[9]

■ We find no need to engage in an analysis of whether Christiansen's testimony was offered for rehabilitative purposes or as substantive evidence in order to decide the present case. Even if we assume, for the sake of argument, that Christiansen's testimony in response to the Commonwealth's cross-examination was hearsay instead of rehabilitation, any error by the trial court was undoubtedly harmless.

The United States Supreme Court explained that a nonconstitutional evidentiary error may be deemed harmless if the reviewing court can say with fair assurance that the judgment was not substantially swayed by the error.[10] And the inquiry is not simply "whether there was enough [evidence] to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand." [11] In the present case, it is clear that the judgment was not substantially swayed by the admissibility of Christiansen's testimony at the hands of the Commonwealth.

The lack of substantial influence of this testimony is demonstrated in two ways.

---

6. *Engebretsen v. Fairchild Aircraft Corp.*, 21 F.3d 721 (6th Cir.1994) (emphasis added).

7. *See* McCormick on Evidence, Ch. 5 § 47 (5th ed.2003).

8. This Court recently ruled on this issue, although the testimony and factual circumstances were slightly different from those in the present case. *See James v. Commonwealth*, 360 S.W.3d 189, 205–07 (Ky.2012); *see also Noel v. Commonwealth*, 76 S.W.3d 923, 929 (Ky.2002). In *James*, we noted that a prior consistent statement used solely for rehabilitative purposes is not admitted under KRE 801A(a)(2) because KRE 801(A)(a)(2) does not even address the scenario but, rather, is admitted as non-hearsay offered not for the truth of the matter asserted. *Id.* at 206. *See also* Robert G. Lawson, The Kentucky Law Handbook § 8.10[3], at 581 (4th ed. 2003) ("[KRE 801A(a)(2)] is silent with respect to the propriety of using evidence of prior consistent statements for other purposes (most notably for rehabilitation after impeachment that does not involve a claim of recent fabri-

cation or improper influence or motive)."). "In these situations, of course, the prior statement would have to be used for credibility and not for substantive purposes (there being no applicable hearsay exception), and the opposing party would be entitled to a limiting instruction to that effect upon request." Lawson, The Kentucky Law Handbook § 8.10[3], at 583.

9. *See* Frank W. Bullock, Jr. & Steven Gardner, *Prior Consistent Statements and the Premotive Rule*, 24 F.S.U. L.Rev. 509, 521–22 nn. 86–96 (1997) (outlining that the Second, Third, Fourth, Sixth, Seventh, and Eighth Circuits agree that prior consistent statements offered for rehabilitative purposes are not subject to premotive requirement under FRE 801(d)(1)(B); the Ninth Circuit is alone in concluding such statements must satisfy FRE 801(d)(1)(B) to be admissible).

10. *See Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

11. *Id.*

First, over the course of two days of testimony, Knights bombarded the jury with dramatic outbursts and repeated accusations that Murray killed Spencer. The only risk of prejudice arising from Christiansen's testimony was the potentially cumulative effect of having the jury hear testimony repeated yet again that Murray killed Spencer. But Christiansen's testimony was not nearly as direct and animated as Knights's testimony had been, and it offered nothing that the jury had not already heard. Second, it is inconceivable that a handful of questions of Christiansen in rehabilitation of Knights could substantially sway the jury after two days of relentless attacks by Murray's counsel using Knights's apparent inconsistent prior statements. Murray's counsel's cross-examination repeatedly suggested that Knights was lying as counsel confronted Knights with the text of statements he had previously made. In fact, at one point in his testimony, Knights implored the judge to stop Murray's counsel from calling him a liar. After witnessing this display, it is hard for us to imagine that the jury could be swayed by a few short questions asked of Christiansen by the Commonwealth. The error, if error at all, was undoubtedly harmless.

## B. The Trial Court Properly Decided to Try the Murder Charges in a Single Trial.

Murray argues that the trial court abused its discretion and committed reversible error by failing to sever the murder charges for separate trials. The crux of Murray's argument is that the murders were not sufficiently related to warrant a single trial and that trying them together was highly prejudicial to him. As a result, Murray requests his conviction be reversed. Murray moved for separate trials before the jury was sworn, properly preserving the issue for appeal.[12]

Kentucky Rules of Criminal Procedure (RCr) 6.18 permits the joinder of multiple offenses in a single indictment if the offenses are (1) of the same or similar character or (2) based on the same acts or transactions connected together or constituting parts of a common scheme or plan.[13] If the requirements of RCr 6.18 are satisfied but the joinder would be prejudicial, the court may order separate trials under RCr 9.16.[14] These rules attempt to strike the proper balance between the prejudice inherent in the joinder of charges in a single trial and the interests of judicial economy. In determining the proper balance, trial courts have long been afforded a great deal of discretion when dealing with joinder. This Court will not overturn a trial court's joinder determination absent a showing of actual prejudice and a clear abuse of discretion.[15] We must be clearly convinced that prejudice occurred and that the likelihood of prejudice was so clearly demonstrated to the trial judge that the refusal to grant a severance was an abuse of discretion.[16]

Admittedly, "prejudice is inherent in the joinder of offenses, as it is in any indictment."[17] Accordingly, this Court re-

---

12. *See Wilson v. Commonwealth,* 695 S.W.2d 854, 858 (Ky.1985).

13. RCr 6.18.

14. *See Cohron v. Commonwealth,* 306 S.W.3d 489, 493 (Ky.2010) (citing *Sebastian v. Commonwealth,* 623 S.W.2d 880, 881 (Ky.1981)).

15. *Id. See also Sherley v. Commonwealth,* 889 S.W.2d 794 (Ky.1994).

16. *Wilson,* 695 S.W.2d at 858 (citing *Rachel v. Commonwealth,* 523 S.W.2d 395 (Ky.1975)).

17. *Peacher v. Commonwealth,* 391 S.W.3d 821 (Ky.2013).

quires that the prejudice requiring severance under RCr 9.16 be "undue prejudice, *i.e.,* goes beyond the inherent prejudice to that which is unnecessary and unreasonable." [18] In determining if prejudice is present, this Court has historically weighed the extent to which evidence from one of the offenses would be admissible in a separate trial of the other offense(s).[19] In the case at hand, we find a clear "logical relationship" indicating that the crimes in issue arose one from the other.[20]

Murray presents three bases to support his severance argument. First, he insists that the murders of Penney and Spencer were separate and distinct incidents, sharing nothing in common with the exception of the co-indictment of Murray and Knights. Second, Murray argues that evidence of Spencer's murder would not have been admissible in a separate trial for Penney's murder. Third, Murray argues the murder counts should have been severed because there was no common scheme or plan to commit them. We disagree.

■ Testimony at trial and evidence presented during discovery shows that Knights and Murray took items, including five knives according to Murray's own statement to police, from the army surplus store where Spencer worked and was murdered. Both Murray and Knights carried a knife stolen from the army surplus store with them to Penney's apartment. Finally, Knights admitted to using a knife to stab Penney; and there was evidence to show the knife was from the army surplus store. As a result, the two murder charges are bound together by, at the very least, a "logical relationship." [21] Murray admits that this is a connection between the two crimes, but he argues this connection should not be heavily weighed because of the alleged absence of a plan to use the knife to kill Penney. Again, we disagree.

■ Allowing joinder of crimes when evidence of one crime is used in the commission of or found at the scene of the other crime is a situation held to be acceptable.[22] Mutual admissibility in the context of joinder does not require a defendant to steal contraband with the intent to use it. The absence of a stated plan to use evidence obtained in the commission of one crime for the commission of another crime would not render the evidence inadmissible. Accordingly, the absence of proof of such a plan does not result in undue prejudice that would prevent joinder. Here, it is sufficient for joinder that Murray and Knights stole knives from the army surplus store and used them at Penney's apartment.

Separating the murder charges in the present case for separate trials would be unduly burdensome. Separate trials would involve a great deal of duplicate testimony, witnesses, and evidence. Cognizant of the type of prejudice Kentucky Rules of Evidence (KRE) 404 is designed to avoid, we are not persuaded that Mur-

---

18. *Id.* (internal quotation marks omitted).

19. *Rearick v. Commonwealth,* 858 S.W.2d 185, 187 (Ky.1993). *See also Cohron,* 306 S.W.3d at 493;

20. *See Peacher,* 391 S.W.3d 821.

21. *See Peacher,* 391 S.W.3d 821. *See also United States v. Caldwell,* 560 F.3d 1202, 1212 (10th Cir.2009) ("Ultimately, the test for proper joinder is a common thread to each of the defendants, which may be established by common evidence as to various counts.").

22. *See United States v. Jackson,* 756 F.2d 703 (9th Cir.1985) (Allowing the joinder of murder and robbery charges where the defendant murdered an individual, stole his van, and then used the van as the escape vehicle in a robbery.). *See also Brasher v. Commonwealth,* 2003 WL 1204081 (Ky.2003).

ray's evidentiary objection warrants the overturning of his convictions.[23] Indeed, the evidence in the present case arguably satisfies KRE 404(b)(2). As such, we are unwilling to say that an abuse of discretion occurred or that Murray was unduly prejudiced by the joinder of the two counts of murder into a single trial. Murray's arguments fall short of the mark. We find that the "promotion of economy and efficiency in judicial administration by the avoidance of needless multiplicity of trials" outweighs any prejudice claimed by Murray.[24]

## C. The Trial Court Correctly Refused to Dismiss the Tampering With Physical Evidence Charges as Unconstitutional.

Murray argues that the two counts of tampering with physical evidence violate his Fifth Amendment right against self-incrimination, as well as his rights under Section Eleven of the Kentucky Constitution,[25] and should have been dismissed accordingly. We disagree and find no error by the trial court.

 The Self-incrimination Clause of the Fifth Amendment reads: "No person . . . shall be compelled in any criminal case to be a witness against himself." The Supreme Court has repeatedly held the privilege applies only when an individual is "incriminated by his own compelled testimonial communications."[26] Sufficient compulsion for an individual to become cloaked by the Fifth Amendment's protection does not easily arise. An individual is compelled, for purposes of protecting against self-incrimination, only when "physical or moral compulsion [is] exerted on the person asserting the privilege,"[27] or when an individual is required to "disclose any knowledge he might have, or to speak his guilt."[28] Further, the Fifth Amend-

---

**23.** In light of KRE 404(b), we have traditionally asked "whether evidence necessary to prove each offense would have been admissible in a separate trial of the other." *Peacher*, 391 S.W.3d 821 (citing *Roark v. Commonwealth*, 90 S.W.3d 24, 28 (Ky.2002); *Price v. Commonwealth*, 31 S.W.3d 885 (Ky.2000)) ("The weapon that caused the death of Melvina Hamilton was found in the same location as the narcotics and paraphernalia, over which Appellant possessed control. Appellant was also convicted of tampering, which can be linked to both the wanton murder and drug trafficking charges. In addition, the specific trafficking charge in question involves possession of a firearm. Here the firearm was the weapon used to end the life of Melvina Hamilton."); *Rearick v. Commonwealth*, 858 S.W.2d 185 (Ky.1993). Further, if the evidence is mutually admissible, "then the evidentiary objections to joinder, at least, have been deemed answered." *Id.* (citing *Keeling v. Commonwealth*, 381 S.W.3d 248, 270–72 (Ky.2012)).

**24.** *Brown v. Commonwealth*, 458 S.W.2d 444, 447 (Ky.1970).

**25.** Our case law makes clear that the protections afforded citizens under Section Eleven

of the Kentucky Constitution and the Fifth Amendment to the United States Constitution are one and the same. *See Commonwealth v. Cooper*, 899 S.W.2d 75, 78 (Ky.1995) ("*Newman v. Stinson* . . . and our prior decisions are clear and we reiterate that Section Eleven of the Constitution of Kentucky and the Fifth Amendment to the Constitution of the United States are coextensive and provide identical protections against self-incrimination."). *See also Newman v. Stinson*, 489 S.W.2d 826 (Ky. 1972) (discussing historical parallel between the Fifth Amendment to the Constitution of the United States and Section Eleven of the Constitution of Kentucky).

**26.** *Doe v. United States*, 487 U.S. 201, 207, 108 S.Ct. 2341, 101 L.Ed.2d 184 (1988).

**27.** *Fisher v. United States*, 425 U.S. 391, 397, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976) (quoting *Perlman v. United States*, 247 U.S. 7, 15, 38 S.Ct. 417, 62 L.Ed. 950 (1918)) (internal quotation marks omitted).

**28.** *Doe*, 487 U.S. at 211, 108 S.Ct. 2341 (quoting *United States v. Wade*, 388 U.S. 218, 222–23, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967)) (internal quotation marks omitted). "It is the

ment "does not proscribe the compelled production of every sort of incriminating evidence but applies only when the accused is compelled to make a Testimonial Communication that is incriminating."[29] Which begs the question, what is a "testimonial communication?" For purposes of self-incrimination, a communication is testimonial when the communication itself, "explicitly or implicitly, relate[s] a factual assertion or disclose[s] information."[30]

■ Notably, self-incrimination jurisprudence, while providing protection for the production of documents, *i.e.* communications, does not provide protection for physical or real evidence. Indeed, the privilege against self-incrimination "does not extend to demonstrative, physical or real evidence."[31]

■ Murray's argument attempts to deflect the focus of analysis from the actual evidence involved in Murray's tampering with *physical* evidence charge. We agree that documents have warranted protection under the Fifth Amendment; but the present case does not involve documents or even, as according to Murray, an "act of

production."[32] Tampering with physical evidence does not involve testimonial communications as defined under the Fifth Amendment to the United States Constitution and Section Eleven of the Constitution of Kentucky. There was no error in these charges.

Additionally, Murray was in no way "compelled" to produce evidence evincing his guilt. Tampering with physical evidence, as defined in Kentucky Revised Statutes (KRS) 524.100, does not *compel* any action. It does not require a defendant to produce evidence by bringing the murder weapon to the police station or anything of the like. Rather, the statute demands that an individual *refrain* from committing an act. An individual accused of tampering with physical evidence does not undergo "legal compulsion [intended] to extract from [him] a sworn communication of facts which would incriminate him."[33]

We would be remiss if we did not note the important role played by the crime of tampering with physical evidence in the effective administration of justice. The

---

extortion of information from the accused; the attempt to force him to disclose the contents of his own mind, that implicates the Self-incrimination Clause." *Id.* (citations and internal quotation marks omitted).

29. *Fisher*, 425 U.S. at 408, 96 S.Ct. 1569. *See also United States v. Hubbell*, 530 U.S. 27, 34–38, 120 S.Ct. 2037, 147 L.Ed.2d 24 (2000).

30. *Doe*, 487 U.S. at 210, 108 S.Ct. 2341. "Unless some attempt is made to secure a communication—written, oral or otherwise—upon which reliance is to be placed as involving the accused's consciousness of the facts and the operations of his mind in expressing it, the demand made upon him is not a testimonial one." *Id.*

31. *Sholler v. Commonwealth*, 969 S.W.2d 706, 711 (Ky.1998). While all involving acts of compulsion not present here, see also *Schmer-*

ber v. California, 384 U.S. 757, 765, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966); *Gilbert v. California*, 388 U.S. 263, 266–67, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967); *United States v. Dionisio*, 410 U.S. 1, 7, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973); *Wade*, 388 U.S. at 221–22, 87 S.Ct. 1926; and *Holt v. United States*, 218 U.S. 245, 252–53, 31 S.Ct. 2, 54 L.Ed. 1021 (1910), for examples of physical evidence not afforded Fifth Amendment protection.

32. Murray attempts to convince this Court that tampering with physical evidence is an act of production by citing to several cases dealing with producing documents under subpoena. We fail to see the connection. More telling, the Supreme Court of the United States has failed to see the connection throughout its development of Fifth Amendment protection.

33. *Doe*, 487 U.S. at 212, 108 S.Ct. 2341.

importance of a trial founded on authentic evidence cannot be overstated. Tampering with physical evidence obfuscates the judicial process and promotes results that are antithetical to the desired goal of this Commonwealth's justice system. The trial court did not err in refusing to dismiss the tampering charges.

### D. The Admission of Testimony Regarding Homosexual Conduct Between Knights and Murray was Appropriate.

Murray urges this Court to find his trial unfair because the trial court improperly allowed evidence suggesting a homosexual relationship with Knights. According to Murray, this evidence rendered his trial unfair because it was an "unnecessary smear" on his character, highly prejudicial, and lacking in relevance. We disagree.

In opening statement, Murray's counsel introduced Murray to the jury and described Murray's relationship with Knights as fraught with intimidation, violence, control, and manipulation. He described Knights, who retained some hearing ability, as domineering while Murray, who was totally deaf, was submissive, sensitive, and a follower. The defense's theory of the case was that Murray went along with everything and did not go to police because Knights had a violent disposition and used force and intimidation to control him. As a result, the nature of the relationship between Murray and Knights was highly relevant.

Under Kentucky law, evidence must be relevant to be admissible. But relevant evidence may be excluded if the probative value of the evidence is substantially outweighed by the danger of undue prejudice.[34] In this case, Murray's primary claim of prejudice is that the relationship was homosexual; and the jurors may have been inflamed because a high percentage of the county voted against a constitutional amendment allowing gay marriage. We find this argument meritless and see no reason to distinguish this case from *Smith v. Commonwealth*,[35] in which we allowed testimony regarding an alleged lesbian relationship between the defendant and a houseguest. In *Smith*, the defendant, convicted of manslaughter, claimed that the houseguest was a "dominating presence," "controlled the household," and "had a profound influence on the lives of [the defendant] and her husband"[36] in order to prove diminished responsibility. On cross-examination, the Commonwealth elicited testimony from the defendant regarding the intimate nature of her relationship with the houseguest, including where the houseguest slept at night, resulting in the defendant admitting they were lovers.[37] This Court found that the defendant "opened the door to a reasonable inquiry" into the means by which the houseguest exerted such influence over her.[38] Particularly applicable to Murray's argument in this case, in *Smith*, we noted that "[w]hen proper cross-examination reveals conduct which may be stigmatized, that alone is not grounds for its exclusion."[39] The potential for an inflamed jury can be properly dealt with during voir dire: Murray has not shown the evidence of homosexual behavior between Knights and himself to be unduly prejudicial. Any

34. KRE 403.

35. 904 S.W.2d 220 (Ky.1995).

36. *Id.* at 221–22.

37. *Id.* at 222.

38. *Id.*

39. *Id.* at 223 (citing *Dyer v. Commonwealth*, 816 S.W.2d 647 (Ky.1991)).

alleged prejudice certainly does not outweigh the evidence's probative value.

Accordingly, we find that "[t]he jury was entitled to see the entire picture, not just the self-serving portion [Murray] sought to reveal." [40] By relying on the nature of his relationship with Knights, Murray allowed the Commonwealth to ask probing, relevant questions about the entirety of that relationship and rebut any assertion that Murray was afraid or intimidated by Knights. "One may not portray another as having dominated his life and thereby diminished his own responsibility without explaining how such domination was accomplished." [41] The trial court did not err.

### E. The Failure to Instruct the Jury on Criminal Facilitation to Murder and Robbery was not Error.

Murray argues that the trial court abused its discretion in failing to instruct the jury on criminal facilitation for the murder and robbery of Spencer. The trial court denied Murray's timely objection [42] on criminal facilitation, and we find the trial court did not abuse its discretion in doing so.

The trial judge must prepare and give instructions based on the whole law of the case "applicable to every state of [the] case covered by the indictment and deducible from or supported to any extent by the testimony." [43] But this duty does not require an instruction on a theory with no evidentiary foundation.[44] An instruction on a lesser-included offense [45] is required if, and only if, a reasonable juror, considering the totality of the circumstances, might have a reasonable doubt as to the defendant's guilt of the greater offense and, yet, believe beyond a reasonable doubt that the defendant is guilty of the lesser offense.[46] But "[a]n instruction on a lesser included offense requiring a different mental state from the primary offense is unwarranted unless there is evidence supporting the existence of both mental states." [47]

Here, Murray argues that criminal facilitation can be established through proof that he did not act intentionally during the murder and robbery of Spencer but was merely knowledgeable in acting as a lookout for Knights. As a result, he argues the trial court erred by refusing to

**40.** *Id.*

**41.** *Id.* at 222.

**42.** Murray properly preserved the issue by objecting with specificity at the close of evidence. *See Commonwealth v. Duke,* 750 S.W.2d 432, 433 (Ky.1988); Kentucky Rules of Criminal Procedure (RCr) 9.54(2).

**43.** *Rice v. Commonwealth,* 472 S.W.2d 512, 513 (Ky.1971) (citation and internal quotations omitted); *see* RCr 9.54(1).

**44.** *Houston v. Commonwealth,* 975 S.W.2d 925, 929 (Ky.1998) (citations omitted).

**45.** A *lesser-included offense* is defined in Kentucky Revised Statutes (KRS) 505.020(2) as an offense "established by proof of the same

or less than all the facts required to establish the commission of the offense charged," "consist[ing] of an attempt to commit the offense charged or to commit an offense otherwise included therein," "differ[ing] from the offense charged only in the respect that a lesser kind of culpability suffices to establish its commission," or "differ[ing] from the offense charged only in the respect that a less serious injury or risk of injury to the same person, property or public interest suffices to establish its commission." Both parties agree, and our case law supports, that criminal facilitation, KRS 506.080, is a lesser-included offense of complicity, KRS 520.020.

**46.** *Id.* (citation omitted).

**47.** *Taylor v. Commonwealth,* 995 S.W.2d 355, 362 (Ky.1999).

give the jury an instruction for criminal facilitation. We disagree.

Both statutes at issue require knowledge that "the principal actor is committing or intends to commit a crime."[48] But to prove criminal facilitation, evidence must be shown that the accused only "provided the means or opportunity to commit a crime" and is designed to convict an individual "who is 'wholly indifferent' to the actual completion of the crime."[49] On the other hand, complicity requires the accused to "intend that the crime be committed" and engage in "solicitation, conspiracy, or some form of assistance."[50] The record simply does not support the giving of an instruction for criminal facilitation.

The weight of the evidence presents two competing theories for the crimes, one proffered by the Commonwealth and the other by Murray. The Commonwealth's theory places Murray as a key actor in the murder and robbery of Spencer, intending to commit the crime, and acting in concert with Knights. On the other hand, the defense theory portrays Murray in a role of ignorance, merely following Knights out of fear with minimal knowledge about the incident or Knights's plan.

Murray makes his passive-actor role clear in his own statement to police when he says he was shocked to hear Knights say he killed Spencer; he was not in the plan; he was not expecting it. Then, during opening statement, Murray expressed that he learned later that Spencer was killed, he could not see anything from the front of the store, he was merely an eyewitness and not a lookout,[51] and the mur-

der and robbery were more than he could comprehend.

Knights's testimony paints a drastically different picture with Murray going to the back of the store and killing Spencer. Murray was at the scene of the crime, stole various items from the store where Spencer worked, helped Knights carry the loot back to the homeless shelter, proceeded to store the bags of stolen goods in a storage unit rented under his name, and both he and Knights made repeated trips to the unit to retrieve items.

The evidence is clear: Murray was not merely a facilitator. He did much more than simply provide the "means and opportunity" to commit a crime.

The trial court correctly applied *White v. Commonwealth*.[52] The case at hand is factually similar. In *White*, we held that the

> evidence at trial supported only two theories: that Appellant was an active participant in planning the crime and intended that it be carried out, or that he was an innocent bystander who happened to be present when some of the instruments used in the crime were acquired. There was no middle-ground violation of the facilitation statute.[53]

The facts of this case required the jury to select between two competing theories, and the jury elected to side with the Commonwealth. This Court requires a jury "to decide a criminal case on the evidence as presented or reasonably deducible

---

**48.** *Thompkins v. Commonwealth*, 54 S.W.3d 147, 150 (Ky.2001).

**49.** *Id.*

**50.** *Id.*

**51.** Defense counsel even noted that because of Murray's deafness, he couldn't function as a

"lookout"; and even if he were a "lookout," it would have been pointless.

**52.** 178 S.W.3d 470 (Ky.2005).

**53.** *Id.* at 490–91.

therefrom, not on imaginary scenarios." [54] Murray's criminal-facilitation theory was an imaginary scenario with no factual basis to support it. The trial judge was correct in refusing to instruct on criminal facilitation.

### III. CONCLUSION.

For the foregoing reasons, we affirm Murray's conviction and sentence for two counts of complicity to commit murder, one count of first-degree robbery, one count of first-degree burglary, and two counts of tampering with physical evidence.

All sitting. ABRAMSON, CUNNINGHAM, KELLER, NOBLE, and VENTERS, JJ., concur. SCOTT, J., concurs in result only.